SO ORDERED.

SIGNED this 12th day of June, 2014.



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

_____

**For on-line use but not print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re:<br><br>**DAVID TODD LEONARD and**<br>**MICHELLE LEIGH LEONARD,**<br><br>             **DEBTORS.** | **CASE NO. 09-20190**<br>**CHAPTER 7** |
| **JANICE POSL-BENDSEN, by John R.**<br>**Kurth, guardian and conservator; and**<br>**JOHN R. KURTH, Trustee of the Janice**<br>**Posl-Bendsen Revocable Living Trust,**<br><br>        **PLAINTIFFS**<br><br>v.<br><br>**DAVID TODD LEONARD and**<br>**MICHELLE LEIGH LEONARD,**<br><br>        **DEFENDANTS.** | **ADV. NO. 09-6043** |

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFFS' COMPLAINT**

In this adversary proceeding, creditors Janice Posl-Bendsen, by John R. Kurth, her guardian and conservator, and John R. Kurth as the Trustee of the Janice Posl-Bendsen Revocable Living Trust object to the discharge of their claim against Defendants David Todd Leonard and Michelle Leigh Leonard (Debtors or Defendants) under 11 U.S.C. § 523(a)(2)(A) and (a)(4), and also seek an order denying Debtors' discharges under § 727(a)(4).[1] Trial was held on February 28, 2014. Plaintiffs appeared by Patrick E. Henderson, and Defendants appeared *pro se*. The parties stipulated to the jurisdiction of the Court, and consented to the trial and entry of a final order by the bankruptcy court.[2] For the reasons discussed below, the Court rules in favor of Defendants on all counts.

**FINDINGS OF FACT.**

The Court makes its findings of fact based on the stipulations in the pretrial order, the exhibits of both Plaintiffs and Defendants which were admitted without objection, and the testimony of John Kurth and David Leonard. The Court has also considered the post-trial brief filed by Plaintiffs arguing their contentions.[3] Defendants' brief in response has

---

[1] Additional claims alleged in the complaint were withdrawn by Plaintiffs in the pretrial order. Doc. 218.

[2] Doc. 218. Further, this Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2014). Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

[3] Doc. 222.

Case 09-06043   Doc# 229   Filed 06/12/14   Page 2 of 33

largely been disregarded because it is a recitation of facts not in the trial record.[4] The Court finds the testimony of both witnesses to be credible. Janice Posl-Bendsen (Janice) was not available to testify, either in person or by deposition, because she suffers from advanced cognitive impairment secondary to dementia, and also has medical conditions which require 24-hour supervision and monitoring. She is residing in a care facility in Las Vegas, Nevada. Janice's unavailability created significant impediments to the presentation of both Plaintiffs' and Defendants' cases. On January 30, 2009, after the events which gave rise to this litigation occurred, John R. Kurth, Janice's son, was appointed as her guardian and conservator by order of the District Court of Atchison County, Kansas.[5]

Debtor David Todd Leonard (David) is Janice's second cousin.[6] He was employed by Countrywide as a branch manager from 2002 until May 2007. David and his wife Michelle Leigh Leonard (Michelle) have four children. Michelle was not employed outside the home. David and Janice had occasional contact while they were children. In 2000, the relationship was re-established, and Janice began visiting Debtors and spending time with them and their children.

In 2004 or earlier, Janice inherited over $6 million in Bank of America stock. Also in 2004, Janice started the practice of annually giving each member of the Leonard

---

[4] Doc. 227.

[5] Doc. 1, ¶¶ 8-11.

[6] Janice referred to David Todd Leonard as Todd Leonard.

family $10,000, the maximum annual gift tax exclusion at that time. On May 12, 2004, Janice wrote a letter to Michelle and Todd, stating, "I am so lucky to have all of you in my life. I've needed to be an Auntie Janice for a long time. The kids are such fun and I do enjoy them. Michelle, you were a delight to have on the trip."[7]

John Kurth has not had a good relationship with his mother. During 2003 through 2005, he probably communicated with her quarterly. He did not recall discussing Janice's relationship with Debtors with her. John was afraid that Janice would quickly spend her inheritance because she was not thrifty and had been waiting a long time for the inheritance. Although John suggested she control her spending, he never directly suggested what she should do and did not want to be involved in the management of her property.

In correspondence, Janice referred to herself as "Eccentric Janice."[8] David testified that Janice was very eccentric, demanding, and volatile. John testified that she was determined and headstrong. According to John, Janice has exhibited a pattern throughout her life of befriending people, then getting angry at them and excluding them from her life, only to bring them back into the picture after a year or two as if nothing had happened. Those in Janice's favor experienced her generosity, while those she did not favor were the object of her vindictiveness. John testified that Janice's relationship with Lynda Leonard, David's mother, exhibited the pattern of abrupt changes in relationships.

---

[7] Exh. 56.

[8] Exh. 52.

4

In 2001, Janice executed a Last Will and Testament granting the residue of her estate to Lynda, but in her Revocable Living Trust Agreement, executed in May 2006, she directed that the residue should go to David and Michelle, and expressly stated that none of it should be used for the benefit of Lynda.[9]

Leonard & Bendsen, LLC, a Nevada limited liability company, was formed on September 29, 2005, for the purpose of holding and trading Janice's assets. The articles of organization list Janice as the only member,[10] but a corporation details sheet from the Nevada Secretary of State obtained on April 30, 2007, includes David as a member.[11] David testified that Janice was the 100% owner. A MasterTrader.com account was opened in the name of Leonard & Bendsen, LLC. David also established Fit Trade, LLC, for the purpose of trading stocks; he was the only member of this company.

On May 31, 2006, Janice executed a Revocable Living Trust Agreement, establishing her Trust.[12] Janice was the sole trustee. Janice's controlling and vindictive nature is evidenced by the unusual terms in the Trust concerning John. Upon Janice's death, the only gift to John is accomplished by a direction to the trustee to purchase a new bass boat for John for a total price not to exceed $40,000, reduced by the fair market value of any bass boat owned by John at the time of Janice's death. The Trust further

---

[9] Exh. A at Article VII(B).

[10] Exh. G at 2.

[11] *Id*. at 5.

[12] Exh. 1.

5

directs that the funds be paid directly to the boat dealer and that before delivery of the boat, the trustee name the boat "The Endora" and have the name professionally painted on the boat. The Trust provides that upon Janice's death, the balance of the tangible personal property remaining after the payment of Trust obligations and taxes shall be distributed to "Todd Leonard and Michelle Leonard, or the survivor of the two of them if one of them dies before" Janice, and the residue of any real and personal property not otherwise disposed of shall go into an education trust for Debtors' descendants, up to $200,000, and the balance shall be distributed to "Todd Leonard and Michelle Leonard, or the survivor of them if one of them dies before" Janice.[13] Also on May 31, 2006, Janice executed her Last Will and Testament.[14] It provides for the residue of her estate to be transferred to her Trust, names David as the personal representative of the will, and provides that under no circumstances shall John or any of his descendants take any assets as a result of Janice's death. Also on May 31, 2006, Janice executed a General Durable Power of Attorney naming David as her attorney-in-fact.[15]

Janice's inheritance was initially placed into an account with Merrill Lynch. In 2006, about one-and-one-half years after the opening of the account, the account was frozen by Merrill Lynch. On August 1, 2006, Janice responded by letter to her Merrill Lynch financial advisor asserting that the account was frozen because of her alleged

---

[13] *Id*. at 3 & 6.

[14] Exh. 57.

[15] Exh. 59.

6

"'bad behavior' vacillating on decisions."[16] Merrill Lynch had apparently questioned David's involvement in Janice's affairs, Janice's expenses, and her mental state. For 2004, her expenses were $416,785.39, for 2005, they were $1,487,013.10, and for 2006, they were $436,490.28.[17] On August 11, 2006, Janice executed a Durable Power of Attorney naming David as her attorney-in-fact for the Merrill Lynch account, authorizing him to exercise various powers with respect to the account.[18]

On December 14, 2006, Janice and David executed documents to open a MasterTrader.com account in the name of the "Janice Posl-Bendsen Revocable Living Trust" (the MasterTrader Trust account).[19] David testified that the purpose of the MasterTrader Trust account was for the investment of the funds which were initially in the Merrill Lynch account. The application states that the initial deposit would be $3,200,000. Janice as Trustee, Janice individually, and David are all named in the account documentation. The first document, which appears to be the application to open the account, names the Trust as the customer, and David as "Joint Customer (or Additional Authorized Person)."[20] The second document, labeled "New Account Approval Form," states the Trust is the "Primary Account Holder or Title of Account"

---

[16] Exh. M at 5.

[17] Exh. N.

[18] Exh. 55.

[19] Exh. O.

[20] *Id*. at 1-10.

7

and David is the "Secondary Acct. Holder."[21]  The third document, labeled "Customer Account, Margin and Short Account Agreement," identifies Janice Posl-Bendsen as the "Full Name . . . on Account," and David signed the document as the "Second Party, If Joint Account."[22]  The fourth document, labeled "Trustee Certification," states it applies to the "Janice Posl-Bendsen Revocable Living Trust" and lists both Janice and David as individuals authorized to give orders and other instructions relative to the trust account.[23] Janice signed the certification as the only trustee of the trust.  The fifth document, labeled "Customer Option Agreement," states that the account name is the "Janice Posl-Bendson Revocable Liv."  Janice signed this document as "Trustee" in a block labeled "For use by entity customers only," but both Janice and David signed in a block labeled "For use by individual."[24]  Account statements were addressed as follows:

> Janice Posl-Bendsen
> Janice Posl-Bendsen Rev Living Trust
> D/T/D 05/31/2005
> Janice Posl-Bendsen & Todd Leonard TTEES.[25]

Checks for the account were imprinted:

> Janice Posl-Bendsen Rev Lvg Tr
> Janice Posl-Bendsen &

---

[21] *Id*. at 11-12.

[22] *Id*. at 13-15.

[23] *Id*. at 16.

[24] *Id*. at 17.

[25] *E.g*., exh. 24.

8

Todd Leonard TTEES.[26]

David testified that as to the MasterTrader Trust account, he was a joint customer, not a trustee, that Janice wanted him to be on the account, that Janice had on-line access to the account, that account statements were e-mailed to Janice, that Janice very frequently monitored the account, and that he talked with Janice 2 or 3 times a day. In addition, Janice frequently stayed with the Leonards, once for a couple of months. The MasterTrader Trust account statement for the period ending January 31, 2007, shows a portfolio value of $2,941,248.76.[27] One year later, the statement for the period ending January 31, 2008, shows the portfolio value was $147,001.55.[28] There is no evidence explaining the loss of value.

The MasterTrader Trust account agreement provided for the writing of checks on the cash portion of the balance. David was authorized to sign the checks. Plaintiffs' allegation that the Trust's claim of $586,000[29] against David and Michelle should be excepted from discharge arises solely from MasterTrader Trust account withdrawals

---

[26] *E.g.*, exh. 41.

[27] Exh. 24.

[28] Exh. 46 at 10. The portfolio value stayed above $2 million from April through October 2007, but on November 30, 2007, it was $655,464.22.

[29] Doc. 222-2. The adversary complaint alleges the following transfers of Janice's assets to Debtors by checks signed by David or by wire transfers: Checks to David and Michelle totaling at least $227,000; checks totaling at least $60,000 to Fitness Quest; checks totaling $195,000 and a wire transfer of $55,000 to Fit Trade, LLC; checks totaling $48,000 to Debtors' four children; checks totaling $500 to Lynda Leonard; checks totaling $2,500 to Anthony Wilson; checks totaling $36,754.82 to Lori Larson; and checks totaling $18,039.92 to various vendors. These transfers total $642,794.74. Because $586,000 is the amount of damages stated in Plaintiffs' post-trial brief, the Court finds that to be the actual amount sought to be excepted from discharge.

9

which were authorized by David and were payable to David, David's businesses, or members of David's family, or are otherwise questioned as not having been for Janice's benefit. The exhibit number, check date, payee, check memo, and amount of the transfers which were the subject of the trial are as follows:

| Exh. | | Payee | Memo | Amount |
|------|------|------|------|------|
| 21 | 1/24/07 | Michelle Leonard | Admin. Fees | $ 5,000.00 |
| 22 | 1/24/07 | Fitness Quest | | $ 50,000.00 |
| 26 | 2/10/07 | Michelle Leonard | Admin. Fees | $ 2,500.00 |
| 27 | 2/20/07 | Michelle Leonard | Admin. Fees | $ 5,000.00 |
| 29 | 3/7/07 | Fitness Quest | | $ 10,000.00 |
| 30 | 3/8/07 | Michelle Leonard | Admin. fees | $ 5,000.00 |
| 31 | 3/28/07 | Michelle Leonard | admin. fees | $ 5,000.00 |
| 33 | 4/14/07 | Michelle Leonard | 1st Qtr. Bonus | $ 10,000.00 |
| 34 | 5/3/07 | Todd Leonard | 1st Qtr. Bonus | $ 10,000.00 |
| 35 | 5/20/07 | Lynda Leonard | | $ 500.00 |
| 36 | 5/22/07 | Michelle Leonard | Admin. Services | $ 5,500.00 |
| 37 | 5/29/07 | Michelle Leonard | 07 Gift | $ 12,000.00 |
| 38 | 5/29/07 | Todd Leonard | 07 Gift | $ 12,000.00 |
| 39 | 6/6/07 | Tate Leonard | 07 Gift | $ 12,000.00 |
| 39 | 6/6/07 | Trey Leonard | 07 Gift | $ 12,000.00 |
| 39 | 6/6/07 | Alyssa Leonard | 07 Gift | $ 12,000.00 |
| 39 | 6/6/07 | Alec Leonard | 07 Gift | $ 12,000.00 |
| 40 | 6/7/07 | Lori Larson | | $ 500.00 |
| 44 | 8/5/07 | Michelle Leonard | Admin fees | $ 10,000.00 |
| 43 | 8/5/07 | Todd Leonard | 2nd Qtr. '07 Mg | $ 25,000.00 |
| 43 | 8/24/07 | Todd Leonard | July Bonus | $ 25,000.00 |
| 45 | 9/7/07 | Fit Trade | | $ 90,000.00 |
| 44 | 9/12/07 | Michelle Leonard | special projects | $ 10,000.00 |
| 47 | 9/14/07 | WIRE Fit Trade LLC | | $ 55,000.00 |
| 45 | 9/18/07 | Fit Trade, LLC | | $ 95,000.00 |
| 43 | 10/1/07 | Todd Leonard | Sept. bonus | $ 35,000.00 |
| 43 | 11/12/07 | Todd Leonard | | $ 10,000.00 |
| 44 | 11/21/07 | Michelle Leonard | | $ 10,000.00 |
| 43 | 12/12/07 | Todd Leonard | | $ 25,000.00 |
| 45 | 1/4/08 | Fit Trade | | $ 10,000.00 |
| 43 | 1/28/08 | Todd Leonard | | $ 5,000.00 |

$586,000.00[30]

Of the many checks payable to him, David testified that only the check dated May 3, 2007, for $10,000 bearing the notation "1st Qtr. Bonus"[31] was intended as compensation for services. Thereafter, it was David's understanding that the transfers to him were gifts, since Janice wanted to fully utilize the lifetime gift tax exemption. Under his agreement with Janice, David was voluntarily working for Janice without payment and Janice was voluntarily giving David money not because of his work, but because of her affection for him. David testified that the notations on the checks stating they were for "admin. services" or "bonuses" were mischaracterizations written by David at Janice's direction. The payments were not regular and were not related to performance, as one would expect if there were a compensation-for-services arrangement. Further, some checks written to Michelle bear the "admin. services" notation, even though there is no evidence that she was providing investment services to Janice.

David testified that he wrote each check because he was directed to so by Janice. According to David, not only the checks payable to him, but also the transfers payable to his family and to his companies, Fitness Quest and Fit Trade, were intended by Janice as gifts. David testified that a check for $10,000 payable to Michelle bearing the notation "special projects" was drawn at Janice's direction to pay for Michelle's cosmetic surgery, which Janice promoted, and that he wrote the notation "special projects" because that

---

[30] Doc. 222-1.

[31] Exh. 34.

11

was the phrase Janice used.  David testified the transfers to Fitness Quest, the fitness club partially owned by David, were made because Janice wanted to help David with his business.  David testified that transfers to Fit Trade from Janice's assets were intended by Janice as gifts.  David had established Fit Trade for the purpose of trading stocks.  David was the only member.  David testified that the checks payable to Lori Larson, a person who had formerly worked with David at Countrywide, were for administrative services she performed in organizing Janice's financial affairs.

By August 2008, Janice's relationship with David and his family had disintegrated.  In a letter to her counsel dated August 5, 2008, she stated:

> It seems I have been supporting the Leonard family since 2005.  I'm in Vegas now seeing my Drs. & trying to get my head straight.  The more I dig the deeper it gets . . . Guess I know what all those cash withdrawals are that went into their private account which I was unaware of.
>      . . . I want you to throw the book at them criminal & civil & fraud too if we can.[32]

Janice filed an unverified petition against David and Michelle in the District Court of Johnson County, Kansas, on August 8, 2008.[33]  It alleges that on May 31, 2006, David was granted a general durable power of attorney and pursuant to that power took control of Janice's funds for the alleged purpose of investing and reinvesting the funds for Janice's benefit but misused that power for his own benefit.  Causes of action are alleged against David for breach of fiduciary duty and gross negligence, and against David and

---

[32] Exh. 52.

[33] Exh. 103.

Michelle for civil conspiracy and conversion. The prayer is for damages in the amount of $582,377.00 and other relief. A default judgment was signed on October 8, 2008.[34] Debtors were held jointly and severally liable for $582,377.00, plus interest and costs. In addition, judgment was entered in favor of Janice against David for $550.00 plus interest, and David was ordered to provide an accounting of his transactions regarding Janice's accounts from January 1, 2007, to the date of the judgment. In this action, Plaintiffs do not rely upon any collateral estoppel effect of this default judgment.

In October 2008, John Kurth received a phone call that his mother was hospitalized in Las Vegas. On November 5, 2008, John Kurth agreed to serve as a successor trustee of Janice's Trust.[35] On November 9, 2008, David executed a declination of appointment as a successor trustee of the Trust.[36] Thomas Kolbremer, the other potential successor trustee, executed a similar declination. John Kurth is now serving as the Trustee, but the dispositive provisions of the Trust, including those providing that the assets shall pass to David and Michelle Leonard on the death of Janice, have not been amended. On January 30, 2009, John Kurth was appointed as the guardian and conservator of Janice.[37]

Debtors filed for relief under Chapter 7 on January 29, 2009. David met with their

---

[34] Exh. 50.

[35] Exh. X.

[36] Exh. Z.

[37] Exh. 101.

Case 09-06043    Doc# 229    Filed 06/12/14    Page 13 of 33

counsel three times before the petition was filed and provided materials concerning Debtors' financial affairs. The schedules were presented to David and Michelle for signing during a meeting with the attorney's wife in the attorney's office in the afternoon of the day before the day they were to be filed. David skimmed the documents, but did not read them because he trusted his attorney to have properly prepared them.

As the basis for the denial of discharge under § 727, Plaintiffs rely upon the following alleged inaccuracies and omissions in Debtors' bankruptcy papers: (1) the failure to include the receipt of funds from the Trust as income in the Statement of Financial Affairs (SOFA); (2) the omission of personal property from Schedule B and the SOFA; and (3) the failure to disclose on the SOFA a distribution from a pension or annuity that was allegedly reported on Debtors' 2007 federal income tax return.[38]

In response to question 1 of the SOFA, which asks about income from employment, trade, or business, Debtors listed $361,191 for 2007 and approximately $300,000 for 2008. David testified that the 2007 income represented primarily the gross income of his business, Fit Quest, and included the May 3, 2007, check for $10,000 from Janice's Trust for "1st Qtr, bonus." For the same year, Debtors' federal tax return shows income from wages of $36,191 and other income totaling less than $25,000.[39] There was

---

[38] Following trial, Plaintiffs' counsel was directed to file a post-trial brief addressing, among other things, what is in the record to warrant the denial of discharge under § 727. Only these three items were relied on in the brief, so the Court regards any additional contentions made at trial to have been abandoned.

[39] Exh. 54.

no income reported in response to SOFA question 2, which asks about income from other sources.  SOFA question 18 requests information about the nature, location and names of businesses in which the debtor was an officer, manager, partner, or owner for the six years preceding the bankruptcy filing.  Debtors' SOFA lists Fitness Quest at question 18, and states at question 21 that David holds a 48% interest and two other individuals own 51% and 1% respectively.  The SOFA does not mention Fit Trade, LLC, which David testified was his business, the assets of which were given to him by Janice.  Computer equipment purchased using Janice's trust funds was in Debtors' possession on the date of filing of the petition, but was not included in response to SOFA question 14, which asks about property held for another person, or on Schedule B, which requires debtors to list all their personal property.  David testified that as of the date of filing, the computers had minimal value since they were no longer functional.  In addition, although there was testimony that funds provided by Janice were used to buy one bicycle and that David owned an additional bicycle, the bicycles were not included in Schedule B.  David estimated that their value was $400 to $500.

**PLAINTIFFS' CLAIMS.**

Plaintiffs seek to except their claim of $586,000 from discharge under § 523(a)(2)(A) and (4).  Plaintiffs also seek to deny Debtors discharges under § 727(a)(4).[40]  Defendants respond that Plaintiffs have not sustained their burden of proof

---

[40] The additional claims asserted in the complaint were withdrawn in the pretrial order.

15

as to any of their claims. Plaintiffs also contend that David's testimony included statements made by Janice and that they should be excluded from consideration because they were inadmissable hearsay.

**DISCUSSION.**

### A. The Court has not relied upon any inadmissible hearsay evidence.

As mentioned above, an important factor in this litigation is that Janice was not available to testify. At various times, counsel for Plaintiffs objected to David's statements concerning his interactions with Janice on the ground they were hearsay. Of the four objections during David's direct testimony, one was granted and the answers to three questions were reformulated to not include hearsay. Thereafter, during David's cross-examination, the Court allowed Plaintiffs' counsel to have a standing hearsay objection, stating admissibility would be ruled on later. In their post-trial brief, Plaintiffs argue that David's testimony of statements alleged to have been made by Janice should not be admitted into evidence, but fail to identify any specific testimony which should be stricken under their standing objection.

Hearsay is a statement made by a declarant other than while testifying at trial which is offered in evidence by a party to prove the truth of the matter asserted in the statement.[41] But when the statement is offered other than to prove the truth of the statement, it is not hearsay. "[V]erbal conduct which is assertive but offered as a basis for

---

[41] Fed. R. Evid. 801(c).

inferring something other than the matter asserted [is] . . . excluded from the definition of hearsay."[42]  Hearsay also does not include "a statement made by one person which becomes known to another . . . [when] offered as a circumstance under which the latter acted and as bearing on his conduct."[43]  Also, documents which would be excluded from evidence as hearsay if offered to prove the truth of their content are admissible as non-hearsay bearing upon the motivation of the person testifying.[44]

The Court has examined the transcript of David's testimony and finds that it does not contain hearsay which should be stricken under Plaintiffs' standing objection.  The testimony which gave rise to the standing objection was not hearsay.  David was asked, "[W]hy did you write the checks that you wrote?"[45]  He answered, "Because it was discussed with Janice";[46] and "I wrote the checks as directed by Mrs. Posl-Bendsen."[47]  The Court understands this to be evidence of David's motivation, not testimony about the truth of what Janice may have said.  Similarly, in response to the question, "[W]hen you wrote the admin fees or anything else in the memo line on the checks . . . , were you writing those on your own or from the guidance of Janice," David answered "I was

---

[42]Advisory Committee Notes to 1972 proposed Fed. R. of Evid. 801, *reprinted in* Fed. Civ. Judicial Pro. and Rules at 437-74 (2014 ed., Thomson Reuters).

[43] 2 Barry Russell, *Bankruptcy Evidence Manual*, § 801:5 at 898 (Thomson Reuters 2013).

[44] *Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321, 1322-23 (11th Cir. 1982).

[45] Doc. 224, Partial transcript (part 2) at 2, ll. 17-18.

[46] Id. at 2, l. 19.

[47] *Id*. at 3, ll. 21-22.

directed by Janice."[48]  This is not hearsay.

This is a trial to the Court where Debtors' motivation and intent are at issue, not the truth of Janice's statements as recalled by David.  The Court is capable of admitting the testimony and not regarding it as having been offered to establish the truth of what Janice said.  The Court declines to strike the questioned portions of David's testimony as inadmissible hearsay.

**B.  Plaintiffs have not proven the elements required for excepting a debt from discharge under § 523(a)(2)(A).**

Section 523(a)(2)(A) excepts from discharge debts for money or property to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  Exceptions to discharge are construed liberally in favor of the debtor.[49]  In the Tenth Circuit, to establish a claim is nondischargeable under this subsection, the creditor must prove by a preponderance of the evidence[50] the following elements:  "[1] The debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was [justifiable];[51] and [5] the debtor's representation caused the creditor to sustain a loss."[52]

---

[48] *Id*. at 15, ll. 4-8.

[49] 4 *Collier on Bankruptcy,* ¶ 523.05 at 523-21 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2014).

[50] *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991).

[51] The Court has substituted "justifiable" for "reasonable" in the Tenth Circuit's original language because of the United States Supreme Court's opinion *Field v. Mans*, 516 U.S. 59, 70-76 (1995), which

18

"If there is a duty to disclose, nondisclosure may amount to a misrepresentation."[53] "In order to give full effect to the plain meaning of the disjunctive 'or' in § 523(a)(2)(A), . . . 'actual fraud' is an independent basis for nondischargeability under that subsection."[54] State law controls whether fraud occurred.[55] Under Kansas law, the elements of an action for fraud are: "(1) false statements were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them."[56]

Plaintiffs' theory of recovery under § 523(a)(2)(A) is that Janice was not aware that Debtors made withdrawals from her checking account for their own use, that Debtors failed to inform Janice of the withdrawals, and that Janice was justified in relying upon Debtors to inform her of the withdrawals.

Plaintiffs' evidence in support of their theory is scant. Plaintiffs proved that the

---

held that the reliance must be justifiable, but need not be reasonable.

[52] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[53] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 57:16 at 57-39 (Thomson Reuters 2014).

[54] *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP 2013).

[55] *Id.* at n. 63.

[56] *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803, 808 (2008).

19

checks were drawn by David and were payable to him, his family, and his businesses. But the writing of the checks is a neutral fact; what matters is whether Janice authorized the withdrawals or otherwise knew or should have known about them. The *only* evidence offered by Plaintiffs that Janice was not aware of the withdrawals for the benefit of Debtors was her letter to her attorney dated August 6, 2008, in which she stated, "Guess I know what all those cash withdrawals are that went into their private account which I was unaware of" and the allegations in the state court petition. Given Janice's personality, the Court ascribes little credibility to this evidence as a basis to determine Janice's knowledge at the time the withdrawals were made.

The evidence that Janice knew, or should have known, of the withdrawals is extensive. David testified that Janice talked with Debtors several times a day, visited their home, and once stayed with them for several months. He further testified that account statements were regularly sent to her, that he made the withdrawals upon directions from Janice, that he agreed with her that she would make gifts to Debtors and their children, and that Janice directed David to make the entries on the check notation lines, such as "07 gift" and "admin fees." Janice's practice of making gifts to Debtors and their children began in 2004 and continued through 2007. There is no evidence that David made any attempt to conceal the transfers, which one would expect if they were unauthorized. Rather, David testified that the transfers were made pursuant to Janice's desire to make gifts to fully utilize the lifetime gift tax exemption. Janice's conduct of being extremely close and generous to Debtors and their children, followed by an abrupt

20

change to excluding them from her life and accusing them of taking her money is consistent with the evidence about Janice's personality and pattern of conduct.

The Court finds that Plaintiffs have not sustained their burden of proof for their § 523(a)(2)(A) claim. They have not proven that Debtors made any false representations or failed to inform Janice of facts when they had a duty to do so; that Debtors acted with the intent to deceive Janice; or that Janice relied on the alleged misrepresentations or concealments. The elements of fraud under Kansas law likewise have not been proven.

### C.  The evidence does not prove the elements required to except a debt from discharge under § 523(a)(4).

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Plaintiffs rely upon both the fiduciary relationship and the embezzlement and larceny arms of the subsection.

 "The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. . . . However, state law is relevant to this inquiry."[57]  "For purposes of section 523(a)(4), the definition of 'fiduciary' is narrowly construed, meaning that the applicable nonbankruptcy law that creates a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property."[58]  "[A]n express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4)."[59]  Therefore, not all fiduciary

---

[57] *Young*, 91 F.3d  at 1371.

[58] 4 *Collier on Bankruptcy*, ¶ 523.10[1][d] at 523-73.

[59] *Young*, 91 F.3d at 1371.

relationships which exist under common law or state law rise to the level that is actionable under § 523(a)(4).

"'Under Kansas law, the elements necessary to create an express trust are: (1) an explicit declaration and intention to create a trust; (2) the transfer of lawful and definite property made by a person capable of making transfer thereof; and (3) a requirement to hold the property as trustee for the benefit of a *cestui que trust* with directions as to the manner in which the trust funds are to be applied.'"[60] "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power is sufficient to establish a fiduciary relationship for purposes of dischargeability."[61] "A technical trust differs from an express trust in that the intention of the parties is not relevant, and the parties' fiduciary obligations are imposed by law, not implied by law."[62]

The Court finds that Plaintiffs have not sustained their burden of proof to show a fiduciary relationship. Although on May 31, 2006, Janice executed a General Durable Power of Attorney naming David as her attorney-in-fact, there is no evidence that David was acting pursuant to that power when he signed the checks which are alleged to have been unauthorized. Likewise, although on August 11, 2006, Janice designated David as

---

[60] *Jenkins v. IBD, Inc.*, 489 B.R. 587, 597 (D. Kan. 2013) (*quoting In re Foy*, 2010 WL 2584193, *3 (Bankr. D. Kan. June 21, 2010)).

[61] *Young*, 91 F.3d at 1372 (citations omitted).

[62] *Jenkins v. IBD*, 489 B.R. at 597.

her attorney-in-fact with respect to the Merrill Lynch account, David was not exercising powers under this agreement when he signed checks drawing on cash in the MasterTrader Trust account.

Further, the agreements establishing the MasterTrader Trust account did not create an express or technical trust. Although the account statements and the imprint on the checks identify David as a trustee, a review of the account documentation shows that he was a co-signor, not a trustee. The account documents consistently identify the Trust as the owner of the account, Janice as Trustee of the Trust, and David as either "Joint Customer" or "Additional Authorized Person." There is no document relating to the MasterTrader Trust account which satisfies the requirements of Kansas law for the creation of a fiduciary relationship.

In addition, assuming a fiduciary relationship existed between Janice and one or both Debtors, the denial of discharge requires that the debt to be excepted from discharge be damages for fraud or defalcation while acting as a fiduciary. Fraud, for purposes of § 523(a)(4) "has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud."[63] Plaintiffs provided no evidence of intentional deceit. The United States Supreme Court, in *Bullock v. BankChampaign, N.A.*,[64] recently held that "defalcation" for purposes of § 523(a)(4) requires an intentional wrong. It stated:

> Thus, where the conduct at issue does not involve bad

---

[63] 4 *Collier on Bankruptcy*, ¶ 523.10[1][a] at 523-71.

[64] *Bullock v. BankChampaign, N.A.*, __ U.S. __, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013).

Case 09-06043   Doc# 229   Filed 06/12/14   Page 23 of 33

> faith, moral turpitude, or other immoral conduct, the term
> requires an intentional wrong.  We include as intentional not
> only conduct that the fiduciary knows is improper but also
> reckless conduct of the kind that the criminal law often treats
> as the equivalent.[65]

Plaintiffs have provided no evidence of defalcation.

Plaintiffs also have not proven the elements to except a debt from discharge under the embezzlement or larceny arm of § 523(a)(4).  "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[66]  The required elements include fraudulent intent or deceit.[67]  "'[F]raud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud,'" is required.[68]

As discussed above, the Court finds that Janice knew or should have known of the transfers made by David which are challenged by Plaintiffs.  Further, even if Janice did not have knowledge of each and every transfer, there is no evidence that David acted fraudulently or deceitfully.

### D.  Plaintiffs' complaint for denial of discharge under § 727(a)(4) must be denied.

Section 727(a)(4)(A) provides that a debtor shall be granted a discharge unless

---

[65] *Id*. at 1759.

[66] 4 *Collier on Bankruptcy,* ¶ 523.10[2] at 523-76.

[67] *Id*. at 523-77.

[68] *Hill v. Putvin (In re Putvin)*, 332 B.R. 619, 627 (10th Cir. BAP 2005) (*quoting Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986)).

24

"the debtor knowingly and fraudulently, in or in connection with the case — (A) made a false oath or account." A false statement or omission in a debtor's schedules may be sufficient for the denial of a discharge.[69] Neither the complaint nor the pretrial order identify the specific false statements or omissions Plaintiffs claim are grounds for the denial of Debtors' discharges. In their post-trial brief, Plaintiffs argue the discharges should be denied because (1) Debtors' receipt of funds from the Trust was not disclosed in response to question 1 or 2 of the SOFA, (2) computers and bicycles in Debtors' possession were omitted from Schedule B, (3) the only business listed in response to question 18 of the SOFA was David's 48% interest in Fitness Quest LLC, and (4) a distribution from a pension or annuity allegedly shown on Debtors' 2007 federal income tax return was not shown on the SOFA.[70] The Court has examined each of these allegations and, for the reasons stated below, concludes that Debtors' discharges should not be denied.

One commentator summarizes the law applicable to the denial of discharge under § 727(a)(4) as follows:

> Under current Official Bankruptcy Forms, the debtor is required to verify the completeness and accuracy of any schedule of assets, debts, or affairs filed in a case. However, since the failure to list an asset must be both knowing and fraudulent, mere inadvertence is not sufficient to establish an objection. Where there is a knowing failure to list a substantial asset, an inference of fraudulent intent may be

---

[69] 6 *Collier on Bankruptcy*, ¶727.04[1][c] at 727-38.

[70] Doc. 222.

drawn in the absence of mitigating circumstances. The failure to amend schedules to include omitted information concerning assets is a reckless indifference to the truth, which is equivalent to fraud.

> The false oath or account must relate to a material matter. The failure to list a significant asset is the most frequently established basis for denying discharge under this section, and certainly satisfies the materiality element. Materiality under Code § 727(a)(4)(A) means that the statement must bear a relationship to the debtor's financial transactions or to the bankruptcy estate, concern the disclosure of assets, or relate to the disposition of assets. If there is a failure to list a valuable asset, materiality is established.[71]

The purpose of § 727(a)(4)(A) "is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs."[72] "'The reasons for denying a discharge must be real and substantial, not merely technical and conjectural.'"[73] The burden of proof in litigation under § 727(a)(2)(A) is on the plaintiff to prove each element by a preponderance of the evidence.[74]

> Once the objecting creditor establishes a *prima facie* case for denying the debtor's discharge under § 727, the burden of going forward shifts to the debtor. The ultimate burden, however, rests with the creditor. "Consistent with the 'fresh start' policy underlying the Code, [objections] to discharge should be construed strictly against the creditor and liberally in favor of the debtor."[75]

---

[71] 4 *Norton Bankruptcy Law & Practice*, ¶ 86:11at 86-33 to 86-34.

[72] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

[73] *Id.* (quoting *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934)).

[74] *Cadle Co. v. King (In re King)*, 272 B.R. 281, 288 (Bankr. N.D. Okla. 2002).

[75] *Id.* (*quoting In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (other citations omitted)).

26

**1. Debtors' discharges should not be denied for failure to include the receipt of funds from the Trust in their SOFA.**

Plaintiffs' primary contention is that the Debtors should be denied a discharge because they knowingly and fraudulently failed to disclose income from the Trust they received during the two years preceding the filing of their bankruptcy petition under either question 1 or 2 of the SOFA. Question 1 requires a statement of income from employment or operation of a business, and question 2 requires a statement of income other than from employment or operation of business. "Income" is not defined for purposes of these questions.

There is no decision of the Tenth Circuit Court of Appeals defining the term "income." The Tenth Circuit BAP, when asked to determine the test for income when examining a debtor's income for the purpose of determining what percentage of that income is from farming, noted there are two approaches, one using the definition of gross income from the federal Tax Code, and a more flexible approach based upon the circumstances to reach an equitable result.[76] A bankruptcy court in this circuit has concluded that the specificity and predictability of the Tax Code definition is preferable when the issue concerns giving "guidance to debtors regarding which receipts they must account for in their filing documents and which they may exclude."[77] This Court agrees.

The Tax Code provides as a general rule that "[g]ross income does not include the

[76] *In re Sharp*, 361 B.R. 559, 564 (10th Cir. BAP 2007).

[77] *King*, 272 B.R. at 293.

27

value of property acquired by gift, bequest, devise, or inheritance."[78]  "[T]he statute does not use the term 'gift' in the common-law sense, but in a more colloquial sense. . . . A gift . . . proceeds from a 'detached and disinterested generosity; 'out of affection, respect, admiration, charity, or like impulses.'  And in this regard, the most critical consideration . . . is the transferor's 'intention.'"[79]  Under this definition, gifts do not need to be reported under either question 1 or 2 of the SOFA.

David testified that he included the $10,000 received from the Trust by a check dated May 3, 2007 (for research conducted for Janice) in response to question 1 of the SOFA but did not report any of the additional receipts.  The testimony is unrefuted that David understood these additional receipts to be gifts from Janice.  If this understanding is accurate, the gifts were not required to be disclosed in response to SOFA question 1 or 2.

If David's understanding is not accurate and a portion of the receipts does not qualify as a gift so that it should have been reported, Plaintiffs have not sustained their burden to show that the omission was knowingly and fraudulently made.  Plaintiffs offered no evidence that David knew the receipts should have been included.  Any inference of fraud arising from the simple fact of omission is refuted by David's credible testimony that he relied upon his attorney when completing the SOFA.  Assuming that some of the receipts from the Trust should have been disclosed, Plaintiffs' lack of

---

[78] 26 U.S.C. § 102.

[79] *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960) (citations omitted).

evidence that the omission was knowing and fraudulent is fatal to Plaintiffs'

contentions.[80]

**2. Debtors should not be denied discharges because of the failure to disclose personal property.**

Plaintiffs also contend Debtors should be denied discharges because of their failure

to disclose in their bankruptcy filings their possession of computers purchased with Trust

funds, their ownership of two bicycles, and their interest in Fit Trade, LLC. The fact of

the omissions is established by the record. The crux of this denial of discharge claim is

therefore whether the omissions were material and whether Defendants' omissions were

made knowingly and fraudulently.

David testified that the computers were not functional and therefore had little

value. David testified that the bicycles were valued at $400 to $500. The total value of

the assets listed on Debtors' schedules was $260,200, which included $16,200 for

personal property. Given their insignificant value, the omission of the computers and

bicycles from the schedules was not sufficiently material to be the basis for the denial of

discharge. In addition, there is no record evidence to suggest that these omissions were

either knowing or fraudulent.

In response to question 18 of the SOFA, which asks the nature, location and name

of any business in which the debtor was involved during the 6 years before filing, Debtors

---

[80] Plaintiffs' arguments in their post-trial brief in support of denial of discharge based upon failure to report the receipts from the Trust focus upon whether the receipts fall within the scope of questions 1 and 2. They fail to even acknowledge that the denial of discharge requires knowing and fraudulent omissions, if the reporting was required.

listed Fitness Quest. Plaintiffs allege that the failure to list Fit Trade, LLC, is grounds for the denial of discharge. Fit Trade, LLC, was a trading entity owned by David "to trade funds for Janice Posl-Bendsen's trust account."[81] A separate MasterTrader.com account was set up for Fit Trade.[82] There is no evidence that Fit Trade engaged in any business other than securities trading. As stated in the findings of fact, David made several transfers of Trust funds to Fit Trade. But other than these transfers, there is no evidence of the value of Fit Trade's property during the period when David was managing Janice's assets or thereafter. David testified that he had no interest in Fit Trade when the bankruptcy was filed and that Fit Trade was not disclosed because his counsel, on whom he relied to prepare his schedules, wanted information only about ongoing entities. He also testified that he intended to amend his schedules "once this is resolved, and I know what happened in the situation."[83]

The Court finds that Plaintiffs have not shown that the omission of FitTrade was material or that the omission was knowing and fraudulent. "An oath or admission is material when what is left out 'bears a relationship to the debtor's business transactions or estate or concerns the discovery of assets, business dealings or the existence and disposition of his property."[84] Although a debtor "cannot circumvent section

---

[81] Doc. 218 at 7, ¶¶ 24 & 25.

[82] *Id.* at ¶ 31.

[83] Doc. 223, Partial transcript (part 1) at 53, ll. 2-4.

[84] *Grant v. Benjamin (In re Benjamin)*, 210 B.R. 203, 210 (Bankr. M.D. Fla. 1997) (*quoting Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

30

727(a)(4)(A) by claiming that the omitted information has zero or little value," value may be considered by the Court when determining materiality and ascertaining the debtor's motivation and intent to deceive.[85]  The omission of FitTrade was not material to the value of Debtors' estate, since David had no interest in the company on the date of filing. The omission was not material to Debtors' affairs, other than being an aspect of their relationship with Janice and her finances.  But that relationship was otherwise disclosed through the scheduling of Debtors' liability for the judgment obtained by the Trust.

There is no evidence that the omission was knowing and fraudulent, and the record provides no basis to infer such conduct.  David testified that he relied upon his counsel when the schedules were prepared.  There is nothing from which the Court can infer that Debtors acted otherwise than in good faith or that they had intent to conceal the existence of Fit Trade.  At trial, after having been read the directions for SOFA question 18, David readily testified that Fit Trade should have been included in response to the question and stated his intent to amend his schedules once this matter is resolved, when he will know what should have been included.

The omissions of personal property from Defendants' schedules on which Plaintiffs rely when objecting to discharge are technical and conjectural, not real and substantial.  Creditors were not harmed.  The Chapter 7 Trustee's handling of the case was not impaired by the omissions.  The Chapter 7 trustee is not objecting to discharge.

---

[85] *Id.*

To deny discharges to Debtors would be draconian — their scheduled unsecured debts, without consideration of Plaintiffs' claim, are $332,945.79, comprised primarily of credit card debt. As Debtors recognize in hindsight, by accepting Janice's largess and engaging in a lifestyle which they could not sustain with their earnings, Debtors made unfortunate decisions.

### 3. Debtors should not be denied discharges because of the failure to report pension or annuity distributions.

Finally, Plaintiffs assert as a basis for denial of discharge that Debtors reported $31,927 of distributions from a pension or annuity on their 2007 federal income tax return which was not disclosed in their bankruptcy schedules. Although Debtors' 2007 federal income tax return was admitted as an exhibit, there was no testimony regarding pension or annuity income. The Court's review of the exhibit shows that the $31,927 was listed as "your total basis in traditional IRAs" on Form 8606. The Court finds no reporting of a pension or annuity distribution. Objecting to discharge for the reason urged by Plaintiffs has no merit.

## CONCLUSION.

For the foregoing reasons, the Court denies Plaintiffs' complaint seeking to except Debtors' obligation to them from discharge under § 524(a)(4) and (a)(6), and to deny the Debtors discharges under § 727(a)(4)(A).

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the

Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon

this ruling will be entered on a separate document as required by Federal Rule of

Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58(a)

applicable to this proceeding.

**IT IS SO ORDERED.**

**# # #**

Case 09-06043    Doc# 229    Filed 06/12/14    Page 33 of 33